**Royal RUSSELL and E.D.S. Energy Development Services, Inc., Appellants,**

**v.**

**FRENCH & ASSOCIATES, INC., Richard C. French & Associates, Inc., and Winchester Oil Co., Appellees.**

No. 9268.

Court of Appeals of Texas, Texarkana.

April 8, 1986.

Allen Landerman, Dallas, for appellants.

Morris Gore, Dallas, B.F. Hicks, Mt. Vernon, for appellees.

GRANT, Justice.

Royal Russell and E.D.S. Energy Development Services, Inc. (collectively referred to as E.D.S.) appeal a judgment based on a jury verdict awarding them nothing on their claims against French & Associates, Inc., Richard C. French & Associates, Inc. (collectively referred to as French), Wingate Battle, III, and Battle Group of America, Inc. (collectively referred to as Battle). The trial court also granted judgment against Russell and E.D.S. for rescission and return of $1,440,000.00 purchase money, punitive damages in the amount of $500,000.00, attorney's fees of $19,000.00, and interest in the amount of $266,973.00. The intervenor, Winchester Oil Company, was granted judgment in the amount of $86,640.94, which was the total operation costs, on a theory of joint liability.

Initially, E.D.S. sued French and Battle for operating costs of various oil and gas wells located in the Talco Field in Franklin County, Texas. E.D.S. had agreed to drill oil and gas wells on the Talco Field leases and to convey the working interest in those wells to a joint venture ultimately providing tax benefits to French's investors. French brought a counterclaim against E.D.S. and a third-party action against Royal Russell seeking rescission, based on misrepresentation under the Texas Security Act and common law fraud. When the dispute between the foregoing parties arose, E.D.S. was terminated as operator of the wells and Winchester was hired as the new operator. Winchester intervened to recoup costs for providing goods and services for the wells in which French and Battle had an interest.

E.D.S. contends that the trial court erred in granting a rescission to French, because French failed to show that the securities purchased were covered by Tex.Rev.Civ. Stat.Ann. art. 581-1 et seq. (Vernon 1964 and Supp. 1986). E.D.S. further contends that the trial court erred in rendering a judgment for French, because French failed to show any tender of securities under the Act. E.D.S. also contends that the trial court erred in awarding prejudgment interest, because there was no evidence from which to determine the proper rate. E.D.S. raises no evidence and insufficient evidence points concerning certain jury findings.

 E.D.S. contends that the antifraud provisions in the Securities Act (Tex. Rev.Civ.Stat.Ann. art. 581-1, et seq.) did not cover the assignment of the mineral leases. E.D.S. concedes that the interest falls under the definition of securities, but cites an exemption under the registration requirements of the Act. Although the security was not required under that section to be registered, that exemption does not preclude the application of the antifraud provisions of the Act. *Vick v. George,* 671 S.W.2d 541 (Tex.App.-San Antonio 1983), *rev'd on other grounds,* 686 S.W.2d 99 (Tex.1984). However, the Securities Act does not apply to transactions between joint venturers. *Vick v. George, supra; Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704 (1956).

 The Texas Securities Act defines a "security" to include an investment contract. When the term is applied to a joint venture, the courts look to the meaning of "investment contract." An investment contract is defined by the United States Supreme Court to require three elements: (1) a common enterprise in which a person (2) expects profits (3) solely from the efforts of the promoter or a third party. *Securities & Exchange Commission v. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The sale of an interest in a true joint venture or general partnership generally does not involve the sale of a security because the venturers or partners have the power to participate in the management of the entity and, therefore, the third element of an investment contract is missing. Heath, *New Developments in Real Estate Financing,* 12 St. Mary's L.J. 811, at 862 (1981).

■ A joint venture is a species of partnership of a limited nature by two or more persons jointly prosecuting a particular transaction for mutual benefit or profit. *Booth v. Wilson,* 339 S.W.2d 388 (Tex.Civ. App.-Texarkana 1960, writ ref'd n.r.e.). The four required elements for a joint venture are (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *Ayco Development Corp. v. G.E.T. Serv. Co.,* 616 S.W.2d 184 (Tex. 1981). The wells themselves formed a community of interest for the venture. The profits were to be divided in accordance with the interest owned in the wells, and the expenses were to be borne in proportion to the interest owned.

The last element is more difficult.

■ In the case of *Ayco Development Corp. v. G.E.T. Serv. Co., supra,* the court found that a party owning a joint interest in a well, who did not retain any joint participation, control or operation of the mining effort was not a joint venturer as a matter of law. The contract between French and E.D.S. not only designated the partners as joint venturers, it provided in Article XIV that:

> EDS and FRENCH shall be the only Joint Venturers who shall be entitled to vote concerning Joint Venture business notwithstanding that there may be other Joint Venturers. EDS and FRENCH shall have one (1) vote each.

This contractual relation clearly creates a right of control.

The joint venture agreement designated E.D.S. as the operator; however, this did not preclude French from using its authority to change operators, and this was demonstrated by the fact that E.D.S. was removed as the operator and Winchester was retained to operate the wells. We find that all the necessary elements are present to create a joint venture as a matter of law between French and E.D.S. *State v. Harrington,* 407 S.W.2d 467 (Tex.1966).

Therefore, French is not entitled to recover under the Texas Securities Act, but French has also alleged in the alternative its right to recover under common law fraud.

■ E.D.S. argues that the trial court erred by allowing six percent prejudgment interest which amounted to $266,973.00. Under the Securities Act, prejudgment interest is recoverable on a rescission and when the law does not specify a legal rate, the rate is a matter within the discretion of the trial judge. *First City Nat. Bank of Paris v. Haynes,* 614 S.W.2d 605 (Tex.Civ. App.-Texarkana 1981, no writ). However, since the Securities Act does not apply, interest is not recoverable under the common law remedy.

■ E.D.S. also contends that a tender of the return of the securities was not properly made. A letter was introduced into evidence at the hearing on motion for judgment (French No. 1) which was dated November 1, 1983, tendering to the attorney for E.D.S. the interest in question. The letter was accompanied by an assignment of interest in oil and gas leases (French No. 2). We find that the tender was sufficient as long as it was made prior to the judgment. The trial court determined that a proper tender was made, relinquishing any interest which French had in the securities. E.D.S. did not object at the hearing that the proof of the making of the tender was outside the pleadings, and therefore no error was preserved on this point.

■ E.D.S. takes the position that French obtained tax benefits as an investor, and thus would not be entitled to rescission. The Internal Revenue Code[1] requires an adjustment that will cancel out these tax benefits if the funds are returned as a result of a rescission. E.D.S. also points out that French received $26,000 income from the well, but French also testified that these funds were offset by operating costs due to E.D.S. This expenditure

---

1. I.R.C. § 1254 (West 1982).

had the result of cancelling out the income. Thus, French could not be said to have profited from the project upon receiving back the purchase price.

Russell contends that there is no evidence or alternatively that there is insufficient evidence concerning the jury's findings on the issues of fraud.

French contended that Russell omitted to state that the oil and gas wells would produce large amounts of salt water. French testifies as follows:

Q Were you ever informed—Well, at the time you first signed an agreement with Mr. Russell to start drilling wells did he advise you about the salt water problems in the Talco field?

A No.

Q When was the first time he talked to you about salt water?

A Well, it was real funny. We drilled two and we were told, "Well, that's a good well. You've got good sand here and you've got a nice show of oil. You've got asphalt down here."

Q Who told you that?

At the logging. That's what they said. "Gosh, you have got a good show of oil. Down here you've got asphalt." On three it was the same thing. Same gung-ho deal, you know. Things were looking pretty good. We still hadn't heard much about E.D.S. # 1.

 French demonstrated an awareness that the drilling of oil wells was a highly speculative venture,[2] and the mere showing that the wells were not successful does not prove fraud. Prior to the drilling of the wells, this was not an existing fact upon which fraud could be based. Fraudulent concealment applies only to past or existing material facts and not future facts. *Richmond Trusts v. Kutner*, 504 S.W.2d 539 (Tex.Civ.App.-Dallas 1973, writ

ref'd n.r.e.). Thus, there is no probative evidence on this point that would authorize a recovery under common law fraud.

 Next, E.D.S. complains about the jury finding that it was fraud that Russell represented that, other than amounts specifically set forth in the joint venture agreement, E.D.S. would not incur any additional expenses for which French would be charged, without the written consent of French. The documents are clear to the effect that this language referred to drilling costs, and that E.D.S. was to provide a "turn-key" job on the drilling. The evidence shows that French clearly understood that this would not refer to the maintenance and operation costs. He set forth in his memorandum to the investors the following language:

EDS ("Producing Operator") will submit bills to the working interest owners, generally on a monthly basis, for costs incurred in managing or overseeing the maintenance and operation of the program wells and will cause such bills to be invoiced on a pro rata basis. Any labor and services furnished by EDS or its affiliates, other than the general administrative charges, will be at cost.

French relies on Article XII of the joint venture and drilling agreement which states, "EDS shall not, without the prior written consent of FRENCH, enter into any agreements or transactions which will result in any liability being incurred by FRENCH or its assigns in excess of the amounts set forth in Articles VII and IX herein." Article VII provides for various drilling costs, and Article IX refers to operations after completion of the well. It specifically provides in Section 9.1.5 that, "Completion of test well does not include the costs of drilling and equipping a salt water disposal well if needed." Therefore, French's complaint about the charge for

---

**2.** French indicated in the memorandum that he sent to his investors that he was aware of the speculative nature of the venture. His memorandum uses the following language:

Oil and/or gas exploration is a high-risk venture and the results of the exploration cannot be accurately forecast. No assurance can be given that amounts invested in this program will be recovered or any profit will be realized, nor is there any assurance production will be obtained, that it can be obtained in profitable quantities. In such event, an investor would suffer the loss of his investment.

salt water disposal is not valid. This section also provides that the parties will enter into an operating agreement if the well is capable of producing oil and gas in commercial quantities. It does contain the language that if a conflict exists between the agreement and the operating agreement, the terms and conditions of the joint venture and drilling agreement will control. However, there is no conflict, because Article XII of this instrument makes an exception for Article IX which allows for operating costs. This could not constitute fraud even if this provision were construed to the contrary, because the expenses were incurred after the making of the contract.

■ E.D.S. complains of the jury finding of fraud based upon Russell's failure to state that he had consented to an injunction in an action brought against him by the Securities and Exchange Commission for violation of the security laws. Russell contends that he told French about this matter. A document was introduced into evidence which was an agreed order of permanent injunction by consent. This order enjoins Russell from violating the Securities Act. French contends that under the doctrine set forth in *Huett v. State,* 672 S.W.2d 533 (Tex.App.-Dallas 1984, pet ref'd), that this constituted a material fact that should have been revealed by Russell. In the *Huett* case, the criminal defendant had a felony conviction for which he had been given probation, and that probation had been revoked sentencing him to seven years in the Texas Department of Corrections. The revocation was on appeal when he sold the stock representing that his corporation had $33,000,000.00 in assets when it actually had none, and he was the chief executive officer of the corporation. We do not find this case in point with the present situation. Russell had not failed to reveal a criminal conviction, but rather a civil matter. The judgment states that he agreed that it be entered "without admitting or denying any of the allegations in the plaintiff's complaint." Russell testified that he entered into the judgment, rather than go through the expense of defending the suit. We find this evidence to be insuf-

ficient to support a finding of fraud in this case.

E.D.S. complains of the jury finding that it committed fraud by representing it would convey 100% working interest to the joint venture.

Incorporated into the joint venture and drilling agreements in section 18.1 is a reference to a mutual indemnification agreement signed by E.D.S. and French. The indemnification agreement executed by the parties provides that:

> EDS *will arrange, acquire* or *obtain,* and transfer and assign to the Joint Venture good and merchantable title, with evidence thereof satisfactory to FRENCH of 100% undivided working interest in and to certain oil, gas or mineral leases constituting, in the aggregate the Drilling Prospect in Franklin County, Texas. (Emphasis added.)

Thus, E.D.S. did not represent by the document it owned 100% undivided working interest, but by the instrument E.D.S. assured French that it would arrange, acquire or obtain and then assign the same to French. This language would negate any implication that E.D.S. was representing to own all of the working interest at that time.

■ French accepted partial assignments of the oil, gas and mineral leases dated November 25, 1980, which clearly show the percentage of undivided working interest conveyed to be 75%. French in turn executed on the same date, a reassignment of 25% of the working interest to E.D.S. This complied with the original contract to the extent that each would own 50% of the working interest. French's acceptance of this document which clearly on its face conveyed only 75%, and its action in accepting the 75% interest constituted a bar or waiver as a matter of law of any fraud as to the 100% representation in the original contract. *B & R Development, Inc. v. Rogers,* 561 S.W.2d 639 (Tex.Civ. App.-Texarkana 1977, writ ref'd n.r.e.). Furthermore, the conveyance itself was clear upon its face, and could not be con-

strued to be fraudulent. We find no evidence of fraud on this point.

■ E.D.S. complains of the jury finding that it committed fraud by representing that it would convey 70.85% net revenue interest. The division order and the title opinion show that E.D.S. owned a .682225% working interest in the O.E. Bolin lease "A" being a fifty-acre tract and a twenty-five acre tract in the O. James Survey of Franklin County. The title opinion and division order show that E.D.S. owned .5221% working interest in the A.M. Bolin lease being seventy-three acres in the William F. Dyer Survey in Franklin County. Russell admits that E.D.S. did not have the 70.85% revenue interest, but asserts that at all times he had a sufficient amount to be able to convey French the 35.425% (being one-half of the joint venture) which it was entitled. He disputes any ownership by Winchester in the working interest, but after entering into the agreements, he obtained a title opinion showing that a working interest was owned by Winchester in the Dyer Survey. He later signed division orders reflecting a working interest in Winchester in the Dyer tract.

While E.D.S. did not guarantee that it owned the 70.85% net revenue interest at the time of the making of the contracts, it does not contend that there was any renegotiation as to this percentage of net revenue interest prior to the execution of the assignments. Thus, French was led to believe that it was receiving 35.425% net revenue interest through the assignment (being one-half of the net revenue interest that is called for by the joint venture agreement). On both tracts, French was receiving less interest than the amount contracted for, and the evidence indicates that E.D.S. through its president, Russell, was aware of this percentage of interest. He failed to inform French of this deficiency or to correct the matter by conveying them a sufficient amount of the working interest to constitute the proper percentage of net

working interest, but he accepted the consideration as if he was conveying the interest pursuant to the joint venture agreement. As a joint venturer, E.D.S. was in a fiduciary capacity and also possessed superior knowledge of the title to the mineral interest. The conveying instrument did not specify the percentage of net revenue interest. French relied on E.D.S. and was misled to its detriment by the conveyances. We find sufficient evidence to constitute fraud.

Since only one jury finding of fraud was required for the judgment, the fraud damages will stand.

■ E.D.S. contends that French is not entitled to exemplary damages, because French elected the remedy of rescission instead of the $200,000.00 damages awarded by the jury. Rescission for fraudulent representation authorizes the recovery of exemplary damages. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963); *Briggs v. Rodriguez*, 236 S.W.2d 510 (Tex.Civ.App.-San Antonio 1951, writ ref'd n.r.e.).

■ E.D.S. contends that French is not entitled to attorney's fees; however, French specifically pled for this relief in the first amended original counterclaim and third-party action pursuant to Tex.Rev.Civ. Stat.Ann. art. 2226.[3] Inasmuch as this was a suit based upon a written contract, to wit: the joint venture agreement, we hold that French is entitled to recover attorney's fees.

■ We find that the jury's failure to award E.D.S. anything for operating expense is against the great weight and preponderance of the evidence. Except for French's contention that the expenditure involving the salt water disposal exceeded the allowed amount by $2,000.00 and a charge for $21,500.00 to overhead, the equipment costs and charges for services performed were not disputed by French. E.D.S. maintained and operated the wells

---

**3.** Article 2226 has recently been transferred to Section 38.001 of V.T.C.A., Civil Practice & Remedies Code.

under an operator's agreement, and pursuant to the terms of this contract was entitled to compensation in a reasonable and just amount. There was no dispute that the goods and services were provided and that they were reasonable and necessary.

E.D.S. has complained of being held jointly and severally liable to Winchester for the operations costs incurred after Winchester took over operation of the wells. E.D.S. contends that it did not enter into an operation agreement with Battle, nor did it agree for Winchester to operate the wells.

According to the testimony of Russell, he was removed and Winchester became operator by the will of the majority of the working interest ownership. This is contradictory to the terms of the agreement which gave E.D.S. and French one vote each and precluded Battle from having any vote. Nevertheless, E.D.S. did not legally contest Winchester's being designated the operator of the wells. Since we have already determined that E.D.S. and French were involved in a joint venture, E.D.S. would be jointly and severally liable for the indebtedness attributable to its interest and French's interest for the operating costs.

The agreement between E.D.S. and French specifically prohibited any other interest owner having a vote in the control of the wells.

In the agreement between E.D.S. and Battle in Article VIII the following language appears:

> The rights of the parties hereunder shall be individual and not joint and collective and it is expressly agreed that it is not the purpose or intention of this agreement to create, nor shall the same be construed as creating, a mining partnership, a commercial or other partnership relation, nor shall the operations hereunder be considered or construed as joint venture; but the respective rights and obligations of the parties shall in all respects be individual and be governed by the express provisions hereof.

No language is found giving Battle any control of the mining operation. Therefore, E.D.S. cannot be held liable for any indebtedness attributable to Battle's interest.

The judgment of the trial court is affirmed as to the rescission action against E.D.S. and Royal Russell with a modification striking the award of prejudgment interest. The judgment is reversed and remanded for a new trial as to the action by E.D.S. for operation costs. The judgment is modified and rendered as to Winchester's action against E.D.S. Winchester shall have judgment against E.D.S. in the amount of $64,980.71.